**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| JANE DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | |
| HARVARD PILGRIM HEALTH CARE, INC., ) | Civil Action No. 15-10672 |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____) | |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                            October 11, 2017

**I.      Introduction**

Plaintiff Jane Doe ("Jane") has filed this lawsuit against Defendants Harvard Pilgrim Health Care, Inc., and the Harvard Pilgrim PPO Plan Massachusetts, Group Policy Number 0588660000 (collectively "HPHC") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging HPHC's partial denial of health insurance benefits for residential mental health treatment.  D. 1.  Both Jane and HPHC have moved for summary judgment.  D. 56; D. 63.  For the reasons stated below, the Court ALLOWS HPHC's motion for summary judgment, D. 63, and DENIES Plaintiff's motion for summary judgment, D. 56.

## II.     Factual Background

Unless otherwise noted, all facts are undisputed and are drawn from the administrative record ("AR") filed by HPHC, D. 36,[1] and the parties' Statements of Facts, D. 56-1; D. 63-1; D. 63-2; D. 63-3; D. 66. As explained further below, the Court will only consider the portions of the record prepared prior to and including March 12, 2013.

### A.     <u>Coverage under the Plan</u>

At all relevant times, Jane was a dependent beneficiary of a participant in an HPHC group health benefit plan (the "Plan"). D. 1 ¶ 4. Her father was a member of the Plan through his employer. D. 1 ¶¶ 6-7. The Plan provides coverage for inpatient care, intermediate care and outpatient mental health care only "to the extent Medically Necessary." D. 1 ¶ 9; AR at 35-37. "Intermediate mental health care services" that have been deemed medically necessary—a category that includes "[a]cute residential treatment" and partial hospitalization programs—are covered in full. AR at 79. According to HPHC's Benefit Handbook, HPHC "use[s] clinical review criteria to evaluate whether certain services or procedures are Medically Necessary for a Member's care." AR at 19. The Plan defines medical necessity as follows:

> [t]hose health care services that are consistent with generally accepted principles of professional medical practice as determined by whether: (a) the service is the most appropriate supply or level of service for the Member's condition, considering the potential benefit and harm to the individual; (b) the service is known to be effective, based on scientific evidence, professional standards and expert opinion, in improving health outcomes; and (c) for services and interventions that are not widely used, the use of the service for the Member's condition is based on scientific evidence.

AR at 21-22.

---

[1] The Court recognizes that the parties dispute the contents of the AR and the Court addresses that matter more fully in Section V(A), *infra.*

At the time of Jane's treatment, HPHC contracted with United Behavioral Health ("UBH") to manage mental health benefits and review initial coverage determinations for HPHC members. D. 63-2 ¶ 7; D. 66 ¶ 7. To determine whether a mental health treatment was medically necessary, HPHC employed UBH's Optum Level of Care Guidelines. D. 56-1 ¶ 2; D. 63-2 ¶ 7. According to the Guidelines, a Residential Treatment Center "provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure." AR at 454. Residential Treatment Level of Care requires that one of the following criteria be met:

> (1) The member is experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting; or (2) There is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care; or (3) The member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary.

Id. Additionally, continued treatment must meet six Continued Service Criteria that apply to all levels of care, including, as is relevant here: (6) "The member's current symptoms and/or history provide evidence that relapse or a significant deterioration in functioning would be imminent if the member was transitioned to a lower level of care." AR at 459.

Upon receiving a determination from HPHC that certain treatment is not medically necessary, a member may file an appeal. AR at 52. A claimant must file its appeal within 180 days of the date of service. AR at 51. Claimants appealing medical necessity determinations may not appeal through the informal inquiry process; they must file formal appeals. AR at 52. For denials of continued hospital care, members may also request an expedited review of their appeal. AR at 54. If a member appeals a denial of continuation of coverage—and the claimant continues to be a member under the Plan, the service was previously authorized by HPHC and the service

was not terminated due to a benefit limit in the Handbook—HPHC continues coverage through the completion of its internal appeal process. AR at 53.

The HPHC "Appeal Coordinator will try to obtain all information, including medical records, relevant to the appeal." Id. "The Appeal Coordinator will investigate the appeal and determine if additional information is required from the Member. This information may include medical records, statements from doctors, and bills and receipts for services the Member has received." Id. Appeals of medical necessity determinations are reviewed by "a health care professional in active practice in a specialty that is the same as, or similar to, the medical specialty that typically treats the medical condition that is the subject of the appeal" and had no participation in any prior decision on the claimant's appeal. Id. HPHC then makes decisions based on the following criteria:

> (1) the benefits and the terms and conditions of coverage stated in [the HPHC] Handbook and Schedule of Benefits; (2) the views of medical professionals who have cared for the Member; (3) the views of any specialist who has reviewed the appeal; (4) any relevant records or other documents provided by the Member; and (5) any other relevant information available to us."

AR at 53-54. If HPHC affirms denial of coverage, the decision is sent to the claimant in a letter also containing "the applicable clinical practice and review criteria information relied on to make the decision," the specific reasons the claimant's medical condition, diagnosis and proposed treatment fails to meet these criteria and any alternative treatment options HPHC would cover instead. AR at 54.

If a formal internal appeal is denied, members may (1) request reconsideration of the medical necessity determination by HPHC's "review committee"; (2) file for external review by an independent organization appointed by the Massachusetts Department of Public Health's Office of Patient Protection (OPP); or (3) pursue legal action. AR at 55. A claimant "must request reconsideration within 15 days of the date of [HPHC's] letter denying the appeal." Id. A claimant

may file for reconsideration before seeking an external review, or if the OPP has determined "an appeal is not eligible for external review," but HPHC "will not reconsider an appeal that has been accepted for external review by [OPP]." AR at 56. Claimants may request that the review committee consider additional documents or records for review and may choose to participate in the meeting by phone. AR at 55. The "reconsideration process is voluntary and optional" and is not required for a claimant's exhaustion of administrative remedies. AR at 56.

A claimant may request external review by filing a request with OPP within four months of receiving written notice of HPHC's appeal decision. Id. The request for external review must include several components, including the OPP application form and a "copy of [HPHC's] final appeal decision." Id. OPP may also arrange for expedited external review, which a claimant may request by including a written certification by a physician that a delay in providing the relevant treatment would "pose a serious and immediate threat to the health of the insured." Id. The HPHC Handbook provides that "[t]he decision of the external review agency is binding, and [HPHC] must comply with the decision." Id.

## B. Jane's Mental Health History

Jane suffers from schizoaffective disorder, post-traumatic stress disorder ("PTSD"), anxiety, depression, personality disorder and a learning disorder. AR at 610-11. Jane's mental health issues began in 2012, during her freshman year of college. AR at 547, 577, 593. Jane struggled with her college grades and roommate, whose behavior Jane described as "horrible." AR at 547. At the start of her second semester, Jane "began struggling with depression, anxiety, [and] panic attacks that led her to feeling paralyzed and unable to get out of bed." AR at 493, 577. She sought help at the college infirmary and was prescribed Zoloft. AR at 493, 577, 593. She then "became agitated" and "experienced sensations in her extremities that felt like snakes working

their way to her heart to poison her."  AR at 493, 577.  Her medication was changed to Celexa, which worsened her agitation and delusions.  AR at 493, 593.

In March 2012, Jane withdrew from her classes and returned home.  AR at 547, 577, 593. She was hospitalized for several days at McLean Hospital, where her medications were switched to a combination of Abilify and Wellbutrin, which relieved her of her delusions.  AR at 577, 593; D. 56-1 ¶ 34; D. 63-3 ¶ 34.  Her anxiety and depression, however, persisted.  AR at 593.  Jane continued outpatient treatment with Audrey Rubin, M.D., who identified Jane's symptoms as acute psychosis, accompanied by a history of sexual trauma—a result of bullying by female peers at summer camp at age twelve—and dyslexia.  AR at 493, 577-78, 593, 600-01; D. 56-1 ¶ 36; D. 63-3 ¶ 36.  Following a stable period, Jane again became psychotic that summer, and at the direction of auditory hallucinations telling her to kill herself, went to the roof of her family home.  AR at 493, 578.  She considered jumping, but returned downstairs, concerned about upsetting her family. Id.  She was again hospitalized at McLean for one week in June 2012, where she was diagnosed with psychotic disorder NOS and borderline personality disorder.  AR at 177-80, 493.

Jane returned to college that fall.  AR at 578, 593.  Following the Thanksgiving holiday, which she spent at home, Jane returned to school and experienced "what she described as a hypomanic or manic episode."  Id.  She began hearing auditory hallucinations and having suicidal ideations.  AR at 485, 510, 668.  Her roommates and friends brought her to the emergency room. AR at 593.  She then experienced a series of conflicts with her peers.  AR at 493, 578, 593.  Jane's father came to her college for a week to support her attempt to complete the semester.  AR at 493, 578, 602.  She began Seroquel in December 2012.  AR at 510.  In January 2013, Dr. Rubin referred her to the Austen Riggs Center ("Riggs") for acute psychiatric residential treatment.  AR at 483.

### C.    **Jane's Clinical Treatment at Riggs**

On January 17, 2013, Jane was admitted to Riggs, an out-of-network facility, for residential treatment.  Id.  At this time, HPHC's behavioral health administrator, UBH, authorized coverage for her treatment.  AR at 226.  HPHC provided coverage for Jane's first few weeks at Riggs, until February 12, 2013, when HPHC, on appeal, upheld its denial of continued coverage for Jane's residential treatment.  AR at 441.  Jane nevertheless remained at Riggs until June 18, 2013.  D. 56-1 ¶ 26; D. 63-3 ¶ 26.  On June 18th, Jane was discharged for inpatient treatment at Berkshire Medical Center following an escalation of her symptoms, where she remained for six days.  Id. Jane seeks benefits payments for her residential treatment at Riggs from February 13, 2013 through June 18, 2013.  D. 56 at 1.

#### *1.    Jane's admission to Riggs on January 17, 2013*

Upon admission to Riggs, Jane met with David Flynn, M.D., who conducted Jane's initial clinical assessment.  AR at 485-91.  Dr. Flynn documented Jane's diagnosis as psychotic disorder NOS, mood disorder NOS and non-verbal learning disorder.  AR at 487.  He listed Jane's "symptoms which mitigate against successful outpatient treatment" as including suicidal behavior, self-destructive behavior, inability to live autonomously, depression and anxiety.  AR at 487-89. Jane's medication regimen at the time of admission included Lamictal, Abilify and Seroquel.  AR at 486.  Dr. Flynn noted that Jane "denied current suicidal ideation, intent, or plan."  Id.  He deemed her competent to make the decision to seek treatment in an open setting.  AR at 486, 488.  Dr. Flynn recommended the IRP-G treatment plan, which revolves around group therapy and includes, among other things, psychotherapy four times per week and 24-hour nursing observation.  AR at 490.  He noted Jane's "[a]nticipated length of stay" was "[s]ix weeks evaluation and treatment admission with longer term treatment possible.  [Jane] and her mother are anticipating 4-6 month

stay but are open to longer treatment if indicated." Id. Dr. Flynn reported he discussed with Jane "the possibility of her deferring admission today and coming back after the long weekend, but [Jane] ultimately decided to accept admission today." Id.

On the date of her admission to Riggs, Jane also met with therapist Sharon Krikorian, Ph.D., Jane's treating therapist at Riggs, who recommended a comprehensive evaluation and treatment. AR at 494, 749. On that date, Dr. Krikorian reported Jane "denie[d] current thoughts of suicide or self harm and was able to state clearly and with good eye contact that she could come to nursing if this changes." AR at 749. Additionally, Daltrey Turner, LICSW, met with Jane's mother and explained she would serve as the family liaison during Jane's treatment at Riggs. AR at 549-50.

### 2. HPHC's Initial Approval of Residential Treatment

UBH approved coverage for Jane's admission to Riggs. AR at 226. UBH noted on January 18, relying on information from Dr. Flynn, that Jane had four psychotic episodes and three inpatient admissions in the previous year, poor responses to medication and no current psychosis or suicidal intent. Id. Jane requested coverage for twenty-eight days at the time of admission; UBH approved coverage for seven days. AR at 225-26.

### 3. Jane's Clinical Treatment: January 17, 2013 through March 12, 2013

During Jane's first days at Riggs, she reported she was "happy to be [t]here," but that she also experienced some difficulty "transitioning into a 'new place.'" AR at 749-50. Dr. Krikorian documented Jane's struggle to understand the triggers for her psychosis, her anger and the sadness that "at times leads her to want to punish herself by cutting or suicidal [sic]," AR at 495, and explained Jane's "ability to tolerate her affective experience is impaired," AR at 578. Dr. Mintz reported Jane called her mood disorder "hypomania," and he described Jane as "ranging quickly from smiling to tears." AR at 518. He noted, however, that Jane "has not felt depressed." Id.

Four days into her residency, Jane reported to a nurse that she had had two panic attacks so far, which Jane thought might be due to the stimulation she feels "around her trauma issues" when discussing them in group therapy sessions. AR at 752. Nurses consistently reported seeing Jane interacting with peers and staff in the first week and one reported Jane "appeared in good spirits" at that time. AR at 750-53. Jane went shopping with her family, which she described as bittersweet because her brother missed her, AR at 752, and went out for dinner with friends, AR at 753. A nurse reported Jane said she was "settling in well," but that she was having trouble with sleep and her anxiety. Id.

Jane experienced one event in January that Dr. Krikorian called a "manic" episode. AR at 495. On January 24, 2013, Jane spoke with her younger brother on the telephone, but her mother told her that her brother "was now doing badly and talking to [Jane] would make it worse." AR at 755. At 11:15 p.m. that night, two of Jane's peers told nursing staff Jane was seeing "paper people stabbing her." Id. As Jane described in her discussions with Dr. Krikorian, Jane was seeing "paper people coming out of the walls and dancing and then sticking knives in her ankles." AR at 495. Dr. Mintz also documented this matter in his report. AR at 518. Nursing staff spoke with Jane and kept her company as she ate and shortly thereafter she fell asleep. AR at 755. The next day, Jane said "she was feeling better" and went bowling with friends that evening. AR at 756. Following this episode, Dr. Mintz increased her Seroquel dosage, to which she "responded well." AR at 495. Dr. Mintz wrote that the increased Seroquel improved her sleep and stabilized her moods. AR at 517.

Jane was often seen with peers in late January and early February. AR at 750-65. Jane went to the museum and art store with friends and began a Claymation project that several nurses observed her working on in the following weeks. AR at 757-59. She told nursing staff she enjoyed

working on her project, AR at 759, and she completed it by February 1, 2013, AR at 547. She told Ms. Turner she was considering studying art. Id. She was reported as being in "good spirits," AR at 759, 764, and went out in the evening with friends, AR at 761. She experienced some difficulties with a peer relationship during this time, specifically with a "male peer" who wanted to be in an "exclusive" relationship with her. AR at 754-61. Additionally, several members of the nursing staff noted Jane was concerned with her weight; they monitored her weight loss and eating habits, but Jane denied not eating. AR at 749-59, 764. Jane did not report any hallucinations during this time. AR at 756.

On February 6, 2013, Jane approached nursing staff at 7:50 p.m. complaining of discomfort in her esophagus, a "scratchy" feeling in her throat and shortness of breath following a hike she took that day. AR at 766. After the nurse took Jane's vital signs, a friend drove Jane to the local emergency room. Id. Jane did not receive any medications at the hospital and she returned at 2:45 a.m. with discharge paperwork stating a diagnosis of "anxiety/panic attacks" and "chest wall pain." Id. The next day, Jane reported feeling "much better." Id. She was again seen interacting with peers and staff. AR at 768. Ms. Turner summarized Jane's status, explaining Jane "is curious about what is going on with her, and with assistance seems able to slow down and think," but that "[w]ithout assistance, [Jane] can easily move quickly, making decisions and feeling overwhelmed, in a way that she doesn't fully understand." AR at 548.

On February 10, Jane continued discussing with nurses her difficult relationship with a male peer, and communicated the pressure and concerns she felt regarding her family members. AR at 769. That evening, Jane reported that she "heard the voice of an older man telling her to hurt herself," but nursing staff documented that Jane "was able to not give in to his words." AR at 769-70. Jane was put on the PAS program, which involved moving to a different wing in Riggs

where she slept nearer to nurses and without a roommate, and nursing staff retained Jane's car keys.  Id.  The next day, Jane reported suicidal ideations and thoughts of self-harm but "no plan or intent."  AR at 770.  That evening, Jane reported that "the voice was not there," and she was glad to be near the nurses.  Id.  She "negotiated to go out" with a friend to "buy something at Staples" and reported she "feels she is improving."  Id.  The following day, Jane reported feeling better and negotiated going out with peers in the morning and afternoon.  AR at 771.  She stated her "suicidal ideation and thoughts of cutting" were "manageable" and denied any plan or intent of self-harm or hearing any voices.  AR at 772.  Nursing staff took Jane out of the PAS program, moved Jane back to her original room and returned Jane's car keys to her.  Id.

In his report finalized on February 13, 2013, Dr. Mintz stated Jane denied suicidal ideation or feeling depressed, and that her cognition was "grossly intact," with "adequate attention and memory for this type of treatment."  AR at 512.  He concluded bipolar I disorder seemed "the best fit," with the alternatives including schizoaffective disorder and hysteria.  AR at 512-13.  Dr. Mintz wrote that Jane's primary complaint was lack of sleep and occasionally feeling like her "brain is really fuzzy," which she attributed to the two antipsychotic medications she was taking.  AR at 510.  In late January, Jane complained that she would "zone out" at times.  AR at 511, 756.  He wrote that Jane reported symptoms "consistent with partial complex seizures," noting his intent to investigate "whether mood and psychotic symptoms may have a neurological basis."  AR at 513.  Her increased Seroquel intake, however, "improved sleep and may have contributed to a de-escalation of psychotic symptoms."  Id.  Finally, he diagnosed her with PTSD—although he noted Jane had expressed doubts about whether the summer camp abuse was "real or a psychotic creation"—and personality disorder NOS.  Id.

Throughout February, Jane continued interacting with peers and leaving the Riggs premises to do so. AR at 772-79, 785-87. She went skiing, AR at 772, 785, shopping, AR at 774, and did other recreational activities off-site with peers, AR at 773, 777-78. She discussed her creative talent and the possibility of going to art school with nursing staff. AR at 779. She applied and was approved for medical self-administration. AR at 497.

Jane reported experiencing some delusions in late February. She told Dr. Krikorian that she had "one delusion that the Mafia was out to get her." AR at 497. In Dr. Krikorian's March 6 report, she noted Dr. Mintz had modified Jane's regimen over the month of February, by decreasing her Abilify and increasing her Seroquel, which made her "less prone to manic-like experiences." Id. On February 25, 2013, Jane approached nursing staff reporting she felt "snakes on [her] legs" and voiced her concern that it was a symptom of tapering down on her anti-psychotic medication. AR at 780. Afterwards, however, she was observed interacting with peers and "in good spirits." AR at 781. But on February 27, Jane told nursing staff she was "experiencing delusions around people outside of Riggs, hiding in bushes, watching her and waiting to hurt her." AR at 781, 497. She returned to nursing staff that evening, who provided Jane with a Seroquel to help with her fear. AR at 782. The following day, Jane confessed to nursing staff that she had secretly been in a troublesome relationship with a male peer during this period. AR at 782-83. Jane also revealed to Dr. Krikorian that she had been keeping the three-week relationship a secret. AR at 497. Jane reported that the relationship ended on February 27, AR at 782, but she later reported the relationship continued, AR at 783. In Dr. Mintz's March 3, 2016 report, he wrote that Jane continued to report "psychotic symptoms, including and [sic] old man's voice telling her to run away" and feeling snakes in her body again. AR at 522. He again stated his intent to investigate whether Jane's symptoms had a "neurological basis," as some were "consistent with

partial complex seizures."  AR at 523.  He then revised her diagnosis to schizoaffective disorder.

Id.

In early March, Jane told nursing staff she wanted to "come off all [her] meds and have a clear mind" and that she was frustrated with the community at Riggs.  AR at 789, 793.  She also reported being upset about a relationship with a male peer.  AR at 793.  She felt angry and expressed the desire "to be 'noncompliant,' to feel 'powerful' and not feel like a patient."  AR at 789.  She communicated a desire not to eat.  AR at 789-90.  She denied, however, feeling depressed or experiencing suicidal ideations.  AR at 790.  She was observed interacting with peers and staff, AR at 790-93, went out to go shopping, AR at 791, and went to a concert with peers, AR at 794.

Riggs staff—led by Ms. Turner—also assessed Jane's family dynamic during the course of her treatment.  AR at 541-46, 549-50.  The family assessment stated that Jane's parents "are interested in learning more about the etiology of [Jane's] difficulties" and that the "family's strength is their openness to finding out more about what is going on and to seek out support and resources."  AR at 546.  In her medical file, Ms. Turner noted Jane had initially expected to stay at Riggs for 4-6 months, but later said "she could see being here for a year.  In the long run she wants to return to college, but doesn't imagine she'll be ready until Fall 2014 or Spring 2015." AR at 608.

### 4.    HPHC's Denial of Continued Coverage

UBH conducted three peer-to-peer reviews with Dr. Krikorian from late January to early February 2013 and concluded that Jane was not eligible for continued residential treatment.  AR at 231-38, 265-66, 299-302.  On January 29, 2013, Martin H. Rosenzweig, M.D., summarized his discussion with Dr. Krikorian, focusing primarily on Jane's symptoms prior to admission to Riggs. AR at 266.  He noted Jane was not "currently actively suicidal," but that Dr. Krikorian stated Jane needed the "structure of residential as she needs nursing support when she is unable to sleep and

13

her parents do not have the ability to help her when she is home." Id. He concluded that Jane was not meeting the criteria for continued residential care and could be readied to step down to partial hospitalization, although he noted that Dr. Krikorian communicated to him that Jane did not meet internal criteria for a step down. Id. He approved three additional days for the purpose of preparing a good discharge plan with the involvement of Jane's parents. Id.

On February 4, 2013, James W. Feussner, M.D., Associate Medical Director of UBH, conducted a peer-to-peer review with Dr. Krikorian. AR at 299. In their conversation, Dr. Krikorian reported that Jane was not suicidal or psychotic and "has improved from the medication regimen," which had not been adjusted in two weeks. AR at 299-300. Dr. Feussner concluded that Jane did not meet the level of care criteria for residential treatment. AR at 300.

In a letter sent February 5, 2013, HPHC explained that effective February 6, 2013, Jane's residential treatment would no longer be covered under the Plan. AR at 315. The letter quoted Dr. Feussner's assessment, stating Jane's "acute crisis bringing [her] to the hospital has quieted," and that she "has been able to move towards recovery and seem more like [her]self" such that she no longer "need[s] further help from residential level of care." AR at 316. The letter stated the determination was based on the UBH Level of Care Guidelines. Id. The letter did not provide those criteria, but rather provided the contact information for UBH should she seek more information on the guidelines or her records. Id. The letter provided information on how to appeal the decision. Id. The letter also stated that UBH would authorize coverage for partial hospitalization services with an in-network facility and provided the contact information and availability of three hospitals providing that service. Id.

5.  *Jane's First Appeal:  Formal Internal Appeal through HPHC*

Riggs filed an expedited appeal on Jane's behalf. AR at 440. Michael I. Bennett, M.D., a physician board certified in psychiatry and without affiliation to UBH or Dr. Feussner, conducted

a review of Jane's claim on behalf of HPHC. AR at 427, 440-45. Dr. Bennett upheld the decision denying Jane continued coverage for her residential treatment. AR at 427, 441.

Dr. Bennett provided a basis for his findings in a February 12, 2013 report. AR at 427. He explained, based on his conversation with Dr. Krikorian, that Jane's family was "supportive," and Jane was "currently not psychotic and not suicidal and ha[d] improved on her current medications." AR at 427, 441. He also noted, however, that Jane had recurrent suicidal ideations, her "voices have returned" and there "may be a change in medication." AR at 427. He nevertheless concluded that residential treatment was not medically necessary for Jane. Id. He wrote that Jane "might be safely able to pursue treatment while living at home and attending outpatient treatment . . . but this is not an option that the patient's family and clinicians wish to explore at the current time." Id. He explained Jane did not meet the criteria for residential treatment, nor did she meet all six of the continued service guidelines. Id. He stated that partial hospitalization programming, however, "is medically necessary." Id.

Based on this conclusion, HPHC sent Jane a letter on February 12, 2013, stating that her treatment pending review of her appeal was eligible for coverage, but that treatment past February 12 had been denied. AR at 440-43. This letter provided the conclusions from Dr. Bennett's report and the relevant UBH Guidelines. AR at 441. The letter reiterated that UBH had authorized coverage for partial hospital programming. Id. The letter also provided Jane with guidance on how to file an external appeal with OPP. AR at 442.

### 6. *Jane's Second Appeal: External Appeal through OPP*

On March 7, 2013, OPP informed HPHC that it had received a request for an expedited external review of Jane's appeal, which OPP was sending to Independent Medical Expert Consulting Services, Inc. ("IMEDECS") for review. AR at 433-39. Jane's mother submitted this request, along with information about Jane's treating healthcare provider and a release of medical

records and psychotherapy notes to OPP. AR at 476-79. According to the IMEDECS report, Jane's case file was reviewed by an independent expert reviewer board certified in psychiatry, who works as an assistant clinical professor of psychiatry and medical director of child and adolescent services at a university-affiliated psychiatric hospital, as a psychiatric consultant and in private practice at a university-affiliated psychiatric hospital. AR at 429. The external review was based on materials including correspondence from the Commonwealth of Massachusetts, HPHC and UBH, the Guidelines, and Jane's medical records. AR at 430.

On March 12, 2013, the IMEDECS expert reviewer upheld HPHC's decision to deny continued residential treatment. AR at 429. Applying the Commonwealth's medical necessity definition—almost identical to HPHC's definition in the Handbook, AR at 21-22—the IMEDECS reviewer's report states that continued residential treatment at Riggs was not medically necessary from February 13 onward. AR at 431. The reviewer explained there was:

> no evidence that the patient required 24 hour supervision or nursing care . . . . [Jane] was able to participate in treatment adequately and showed no deficits in self-care skills. The patient's family was involved and supportive of the patient's treatment. While the patient continued to have symptoms of a mood disorder, there was no evidence in the medical record that these symptoms were severe enough to prevent the patient from participating in treatment at a lower level of care such as a PHP (partial hospitalization program) or make treatment at a lower level of care such as a PHP unsafe.

Id.

### D. HPHC's Post-Litigation Administrative Review

After Jane initiated this action in 2015, HPHC filed an assented-to motion to extend time to file a responsive pleading to the complaint, stating "they are in the process of working together in good faith to narrow the issues." D. 16 at 1. On October 8, 2015, the parties filed a joint motion to stay proceedings "pending Administrative Review of her health insurance benefits claims prior to proceeding further with this federal court action," explaining that the resolution of the review

could "moot this action in its entirety."  D. 18 ¶¶ 2-3.  The Court granted the motion.  D. 20.

During the stay, Jane's claim was reviewed by HPHC's Medical Director, who then sent a letter

to Jane's counsel summarizing HPHC's conclusions for denying coverage and Jane submitted

rebuttal opinions to HPHC for further review.  D. 21; D. 23; D. 56-5 at 36-71.  On February 26,

2016, HPHC's general counsel sent a letter to Jane's counsel affirming its denial of Jane's claim.

D. 56-5 at 67-71; D. 64 at 129-49.

### III.    Procedural History

Plaintiffs instituted this action on March 5, 2015.  D. 1.  The parties filed a joint motion to

stay proceedings on October 8, 2015, which the Court granted.  D. 18; D. 20.  Following briefing

by both parties, D. 40; D. 44, the Court allowed the parties to file certain documents from HPHC's

post-litigation review for the Court's consideration, D. 48, 50.  The parties filed cross motions for

summary judgment, D. 56; D. 63, and briefing on whether to further expand the scope of the record,

D. 66; D. 61.  The Court heard the parties on the pending motions and took these matters under

advisement.  D. 69.

### IV.    Standard of Review

In an ERISA case reviewing the denial of coverage, the Court "sits more as an appellate

tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination

in light of the record compiled before the plan fiduciary."  Leahy v. Raytheon Co., 315 F.3d 11,

18 (1st Cir. 2002).  In this context, "the factual determination of eligibility for benefits is decided

solely on the administrative record, and 'the non-moving party is not entitled to the usual

inferences in its favor.'"  Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 235 (1st Cir.

2006) (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)), cert.

denied, 546 U.S. 937 (2005)).  In sum, "where review is based only on the administrative record

before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue." <u>Orndorf</u>, 404 F.3d at 517.

The standard of review governing the Court's analysis determination is a threshold question.  <u>See, e.g.</u>, <u>Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc. (Stephanie II)</u>, 852 F.3d 105, 109 (1st Cir. 2017); <u>Leahy</u>, 315 F.3d at 15.  In ERISA cases, the Court looks to the language of the Plan itself to "determine the standard of judicial review applicable to a claims administrator's denial of benefits."  <u>McDonough v. Aetna Life Ins. Co.</u>, 783 F.3d 374, 379 (1st Cir. 2015).  A court must review the denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).

Discretionary authority "must be expressly provided for," and only when the delegation of such authority is "sufficiently clear and notice of it has been appropriately provided" does the standard of judicial review change from *de novo* review to abuse of discretion.  <u>Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc. (Stephanie I)</u>, 813 F.3d 420, 427 (1st Cir. 2016).  The Plan need not contain any particular words to confer discretion, but "to secure discretionary review, a plan administrator must offer more than subtle inferences drawn from such unrevealing language."  <u>Gross v. Sun Life Assur. Co. of Can. (Gross I)</u>, 734 F.3d 1, 16 (1st Cir. 2013).  Rather, "a grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that <u>unambiguously</u> indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances."  <u>Stephanie I</u>, 813 F.3d at 428 (emphasis in original).

In light of the language in Jane's HPHC Plan, the Court will review HPHC's denial of continued residential treatment coverage *de novo*.  The HPHC Plan states HPHC will "use clinical

review criteria to evaluate whether certain services or procedures are Medically Necessary for a Member's care." AR at 19. Likewise, the Plan's definition of medical necessity points to "generally accepted principles of professional medical practice," and not administrator discretion, as the basis for an HPHC determination. AR at 21-22. The Plan thus relies on external clinical criteria and fails to indicate that an administrator has any leeway when applying these criteria. The Plan language falls short of the unambiguous grant of discretionary authority required in the First Circuit. Cf. Stephanie I, 813 F.3d at 428.

The Court therefore proceeds in *de novo* review of Jane's denial of benefits claim. In doing so, "the court may weigh the facts, resolve conflicts in the evidence, and draw reasonable inferences." Stephanie II, 852 F.3d at 111. The "ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage." Id. at 112-13.

## V. Discussion

### A. Scope of the Administrative Record

As an initial matter, the Court must address the parameters of the administrative record. On September 28, 2016, Jane filed a motion to expand the scope of the record. D. 40. Seeking to preserve Jane's position for the record until the Court could consider and resolve the summary judgment issue, the Court permitted the parties to file certain documents pertaining to a review of Jane's claim conducted by HPHC following Jane's initiation of this lawsuit. D. 50. Although these documents are part of the filings in this case, the Court now concludes they should not be considered as part of the administrative record for the purposes of its review of Jane's claim.

"ERISA benefit-denial cases typically are adjudicated on the record compiled before the plan administrator." Denmark v. Liberty Life Assur. Co. of Bos., 566 F.3d 1, 10 (1st Cir. 2009). Principles of exhaustion and finality dictate that "the final administrative decision acts as a

temporal cut off point." <u>Orndorf</u>, 404 F.3d at 519. A "claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the administrative decision." <u>Id.</u> Here, the parties dispute which administrative decision was the "final" one. HPHC argues the final administrative decision was OPP's affirmation of denial on March 12, 2013. D. 63-1 at 12. If HPHC is correct, no documents that postdate that denial should be part of the administrative record. <u>See, e.g.</u>, <u>Orndorf</u>, 404 F.3d at 519. Jane argues, however, that HPHC's post-litigation decision on February 29, 2016, constitutes the "final administrative decision," and so the documents HPHC reviewed in that process—including medical records and expert opinions Jane submitted—form part of the administrative record. D. 56-2 at 10.

HPHC is correct that the OPP decision from March 2013 is the "final administrative decision." Under the terms of the Plan, Jane exhausted her administrative remedies when her claim was reviewed and denied by OPP's independent reviewer. <u>See</u> AR at 55-56; <u>see also</u> <u>Madera v. Marsh USA, Inc.</u>, 426 F.3d 56, 61 (1st Cir. 2005) (explaining that "[b]efore a plaintiff asserts an ERISA claim . . . he must first exhaust his administrative remedies"). After receiving OPP's decision on March 12, 2013, AR 429, Jane was free to pursue legal action, AR at 55, which she did. D. 1. The final decision upon which Jane's lawsuit was based was the March 12, 2013 decision. D. 1 ¶ 19.

The review the parties conducted after Jane filed this action does not change the operative administrative decision in this case. First, it does not constitute an administrative review as defined by the HPHC Handbook. "[A]n ERISA plan is a form of contract. Thus, contract-law principles inform the construction of an ERISA plan, and the plain language of the plan provisions should normally be given effect." <u>Stephanie II</u>, 852 F.3d at 117 (internal citation omitted). Here, the Plan spells out the procedures a member may follow when HPHC has affirmed a denial of coverage: a

Member may (1) request reconsideration by HPHC's review committee; (2) file for external review with OPP; or (3) file a legal action in court. AR at 55. The only category under which HPHC's 2015-2016 review could fall is the first, but the post-litigation review was not "reconsideration" as outlined by the Handbook. Reconsideration by HPHC's review committee is only available for a claimant if she requests it within fifteen days of the formal denial of coverage and it is unavailable for any claimant whose appeal has been accepted for external review by OPP. AR at 55-56. Here, the 2015-2016 review postdates both the fifteen-day limit and OPP's review of Jane's claim. Furthermore, the post-litigation review was not conducted by a committee, but rather included a report by HPHC's medical director. See D. 56-5 at 36-39. Even if the parties referred to it as an "administrative review" at times, D. 18; D. 21; D. 23, HPHC's post-litigation review of Jane's claim was not an administrative review as defined by the Plan, see AR at 55-56.

Second, the parties cannot override the limitations on the Court's scope of review by agreeing to file additional documents. A "very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator," Denmark, 566 F.3d at 10 (quoting Liston v. UNUM Corp. Officer Sev. Plan, 330 F.3d 19, 23 (1st Cir. 2003)), such as evidence of "personal bias by a plan administrator," Orndorf, 404 F.3d at 520. The parties' voluntary agreement here to provide certain additional information is not a "very good reason." The initial joint motion to stay states "[d]ocuments submitted or generated as part of the Administrative Review, will be part of the Administrative Record in this case." D. 18 ¶¶ 2-3. Additionally, HPHC included medical records postdating the OPP decision when it first submitted the administrative record, and Jane did not dispute it. D. 36. Presumably, both parties believe these records support their respective arguments regarding medical necessity. HPHC has explained that including medical records beyond what any administrator reviewed "was an effort

at conciliation" even though "technically" these documents should not be included in the administrative record "under the law." D. 50 at 16:7-24. Neither party has suggested that these records were before the administrative reviewer at the time of the final administrative review and decision, and that alone is the determining factor defining the administrative record's scope before this Court.

The Court is also wary of converting what may have been reasonable efforts by both parties to resolve the dispute without continuing litigation into a full-blown administrative review. When the parties sought leave of this Court to conduct a review of Jane's claim, they did so in an effort to resolve their dispute short of a disposition on the merits before this Court. See D. 16; D. 18. An insurer's decision to conduct a further review with the hopes of out-of-court resolution is not one this Court seeks to discourage by reopening the administrative record to documents postdating the administrative decisions that led to the litigation in the first place.

Finally, the Court notes that in accepting the March 12, 2013 OPP decision as the "temporal cut off point" for the administrative record, it has also considered Jane's medical records up to and including that date as part of the administrative record. Although HPHC affirmed UBH's denial of coverage on February 12, 2013, the Court must review the record compiled before the administrator of the "final administrative decision," see, e.g., Orndorf, 404 F.3d at 519. The report produced by OPP and IMEDECS states the expert reviewer reviewed Jane's medical records.[2] AR at 430. It does not provide an end date for those records. Thus, the Court has taken an expansive

---

[2] Jane argues the IMEDECS expert did not review her medical records, D. 56-2 at 9 n.2, but the OPP report states that the expert did review these documents, AR at 430, and filing a request for external review with OPP includes a release of medical records and psychotherapy notes, both of which Jane's mother signed and submitted, AR at 476-79. Jane has not argued the administrative record should exclude these medical records. See D. 41; D. 50; D. 56-2.

view and reviewed Jane's medical records up to and including March 12, 2013 as part of the administrative record.

**B.**     **Medical Necessity**

Reviewing Jane's claim *de novo*, the Court concludes that Jane has not met her burden in demonstrating that the treatment at Riggs was medically necessary as defined in the HPHC Plan.

HPHC used UBH Guidelines as a framework when making mental health treatment determinations.  AR at 226; D. 63-2 ¶¶ 8-10.  Jane does not dispute the use of these Guidelines, but rather argues Jane's condition met the requirements.  D. 56 at 12-18.  Specifically, Jane argues she met two of the three criteria for the residential treatment level of care and all six criteria for continued coverage.  Id.  But after review of the medical records and opinions submitted to the Court, the Court concludes Jane has not met her burden of proving that continued residential treatment at Riggs was the "most appropriate" level of care for her condition at that time, AR at 22.

The UBH Guidelines base a patient's qualifications for the residential treatment level of care on whether the patient's condition would be unsafe in a "less restrictive setting" or her treatment would be undermined in a "lower level of care."  AR at 454.  The inquiry thus requires focusing not on whether Jane benefited from her treatment at Riggs, but rather whether it was necessary, as compared to a lower level of treatment, such as a partial hospitalization program. See, e.g., Stephanie II, 852 F.3d at 117 (explaining because ERISA plans are "a form of contract," the inquiry is not whether one's treatment was beneficial to her, "but, rather, whether that course of treatment was covered under the Plan").  Jane has failed to show that her mental health would have been in a worse position if she had transitioned to a lower level of care rather than continued residential treatment at Riggs.

Qualifying for residential treatment coverage under the UBH Guidelines requires proof that a lower level of care would be insufficient either because the patient's "disturbance in mood, affect or cognition [would] result[] in behavior that cannot be safely managed in a less restrictive setting" or "[t]here is an imminent risk that . . . psychosocial stressors will produce significant enough distress or impairment in . . . important areas of functioning to undermine treatment in a lower level of care." AR at 454. The fact that Jane had three inpatient admissions prior to entering Riggs is not sufficient to justify her residential treatment there indefinitely. Similarly, Jane's need for continued treatment in general does not automatically necessitate her continued 24-hour residential treatment.

The UBH Guidelines define residential treatment as being appropriate for patients who "do not require 24-hour nursing care and monitoring . . . but who do require 24-hour structure." Id. The Guidelines do not define or elaborate on the "24-hour structure," however, and the line between needing 24-hour structure, but not 24-hour nursing care or monitoring, is far from clear. Nevertheless, a close review of Jane's medical and treatment records suggests the 24-hour structure was not medically necessary.

Jane was observed interacting with peers and was described, at times, as being "in good spirits" between January 17, 2013 and March 12, 2013. AR at 750-94. Dr. Flynn initially suggested that Jane spend another weekend at home prior to moving in to Riggs. AR at 490. Once admitted, Jane was free to go out with friends and family, and she did so on numerous occasions, going skiing, hiking, bowling, shopping, to dinner and to concerts with friends, with no sign of increased symptoms as a result. AR at 753-94. Records kept by nursing staff show Jane rarely sought assistance in the evenings. AR at 749-94. She was able to begin and complete an art project that impressed staff with her creativity, skill and focus. AR at 757-59, 547. Her sadness and anger

24

at conflicts with friends, see, e.g., AR at 754, 761, 765, and concerns about siblings, AR at 495, 518, 755, do not compel the conclusion that the 24-hour structure was necessary.

The UBH Continued Service Criteria require a showing that "relapse or a significant deterioration in functioning would be imminent if the member was transitioned to a lower level of care." AR at 459. Although Jane may have felt safe at Riggs, see AR at 770, there is no evidence from before or after February 12, 2013 that if she had been discharged to partial hospitalization she would have relapsed or her health would have significantly deteriorated. Jane's struggles with delusions and anxiety during these months appear less severe than in the previous year. See, e.g., AR at 495, 518, 755-56. There was only one period when Jane was monitored more closely by nurses as a result of the Jane's auditory hallucinations, but this period was brief, and Jane was able to seek help and report the problem rather than act on it. AR at 769-72. Jane felt better the following morning, and she went out with friends several times even during this period of closer monitoring. AR at 770-72.

The Court does not seek to minimize the seriousness of Jane's symptoms. The Court, however, cannot conclude on this record that continued residential treatment past February 12, 2013 was medically necessary. Jane's treatment at Riggs was covered for an additional nineteen days after the more concerning January 24, 2013 incident of delusions. AR at 440-43. During that time, Jane continued socializing outside of Riggs with peers and was mostly observed to be in good spirits. AR at 750-61. Dr. Mintz's adjustment to Jane's medication in response to the incident appeared to improve her condition. AR at 495, 517.

When Jane was initially admitted to Riggs, Dr. Flynn reported her symptoms requiring residential treatment as including suicidal behavior, self-destructive behavior, inability to live autonomously, depression and anxiety. AR at 487-89. By February, Jane no longer exhibited at

least the first three of those symptoms.  First, Jane experienced hallucinations encouraging suicide, but she did not take any steps in furtherance of those hallucinations.  AR at 769-72.  Second, Jane does not appear to have engaged in self-destructive behavior.  She participated in her treatment plan, engaged with patients and staff and took advantage of the resources at Riggs during her stay.  AR at 750-94.  Third, Jane displayed an ability to live autonomously.  In addition to Jane's social autonomy at Riggs, id., she was increasingly autonomous in her self-care, AR at 497.  Finally, Jane was not depressed, AR at 518, and her reports of anxiety were infrequent, AR at 766.

The fact that Jane continued to experience symptoms of her mental ailments does not mean she required continued residential treatment.  The diminished intensity of her symptoms, coupled with Jane's ability to administer her own medication successfully, come and go freely and report any issues as they arose suggests that continued residential treatment was no longer medically necessary.

### 1.     *The Medical Opinions*

Several doctors reviewing Jane's claim agreed she did not meet the guidelines for continued residential treatment.  Dr. Rosenzweig concluded as much despite Dr. Krikorian communicating to him that Jane did not meet Riggs's criteria for a step down, approving ongoing residential treatment pending the creation of a discharge plan involving Jane's parents.  AR at 266.  Dr. Feussner also concluded as much after a peer-to-peer review with Dr. Krikorian, acknowledging that Jane experienced ongoing interpersonal and psychological challenges, but explaining she did not need residential level of care.  AR at 300.  Dr. Bennett also concluded residential treatment was not medically necessary.  AR at 427.  Finally, an independent psychiatrist at IMEDECS came to the same conclusion, explaining there was "no evidence that [Jane] required

24 hour supervision or nursing care," as Jane "showed no deficits in self-care skills" and her "family was involved and supportive."  AR at 431.

On the other hand, Dr. Krikorian, Jane's treating therapist, explained when communicating with the doctors at UBH and HPHC that Jane did not meet Riggs' criteria for a lower standard of care.  AR at 266.  The Court is not persuaded that Dr. Krikorian's opinion overcomes the opinions on the other side of the scale.  In ERISA cases, unlike Social Security cases, treating physicians are not entitled to special deference.  See, e.g., Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir. 2010), cert. denied, 562 U.S. 1102 (2010); Orndorf, 404 F.3d at 526; see Gernes v. Health & Welfare Plan of Metro. Cabinet, 841 F. Supp. 2d 502, 510 (D. Mass. 2012); Jon N. v. Blue Cross Blue Shield of Mass., 684 F. Supp. 2d 190, 203 (D. Mass. 2010).  It is unclear what Riggs's internal criteria are for medical necessity, whether they differ from HPHC's and to what degree.  Also, it does not appear from the administrative record—in peer-to-peer discussions with external medical experts or in Dr. Krikorian's internal reports—that Dr. Krikorian explained why continued residential treatment was medically necessary for Jane.

All of the medical professionals agreed that Jane's mental ailments required ongoing treatment of some kind.  But four doctors agree Jane was ready to transition from residential treatment to a partial hospitalization program.  AR at 266, 300, 427, 431.  The burden to show continued residential treatment was medically necessary falls on Jane, see, e.g., Stephanie II, 852 F.3d at 112-13; Richards, 592 F.3d at 239, and she has not satisfied that burden.

### C.  HPHC Conducted a Full and Fair Review of Jane's Claim

Section 503 of ERISA requires every benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  The

statute's implementing regulations list requirements for a "full and fair review," including

providing 180 days for claimants to file appeals, consulting independent medical experts on appeal

and affording no deference to the initial determination. 29 C.F.R. 2560.503-1.

Jane argues that HPHC's internal review of Jane's claim in February 2013 falls short of

ERISA's "full and fair review" requirements by failing to obtain medical records as required by

the Plan. D. 56-2 at 18-20. She argues this misstep "poison[ed]" her "ability to obtain a fair review

from OPP." D. 56-2 at 19.

It is unclear from the administrative record whether UBH possessed or included Jane's

medical records when it transferred Jane's case file to HPHC in February 2013. See AR at 482.

Regardless, HPHC argues they had "substantial medical information," including documents from

Jane's admission to Riggs—containing Dr. Flynn's initial assessment—and their peer-to-peer

reviews with Dr. Krikorian in January and February, in which Dr. Krikorian reported the details

of Jane's health and treatment to administrators. D. 63-1 at 17-18. As a result, Dr. Feussner had

the reports from earlier reviews as well as his own peer-to-peer discussion with Dr. Krikorian when

conducting his own review. D. 63-1 at 18. To the extent administrators lacked a physical medical

record, HPHC continues, it was not for lack of trying; efforts to acquire these documents were

hindered by Riggs's model of documenting only "periodic results." Id. Finally, HPHC notes

OPP's independent review did include a copy of Jane's physical medical records. D. 63-1 at 19;

AR at 430. As discussed, *supra*, these records may have even extended up to and including March

12, 2013, the date OPP denied Jane's claim on review.

Although failing to obtain medical reports does not violate the requirements of the statute's

implementing regulations, "plan administrators ordinarily will be in the best position to develop a

record adequate for the full and fair review required by the statute," as "[a]ll parties will be better

served if ERISA fiduciaries are motivated to develop records that fairly represent all available information about a claimant's condition and capabilities." Gross v. Sun Life Assur. Co. of Can. (Gross II), 763 F.3d 73, 84-85 (1st Cir. 2014), cert. denied, 135 S. Ct. 1477 (2015).

Nevertheless, even if the Court accepted Jane's arguments that HPHC did not review all of her records, Jane has not successfully shown she was prejudiced by these errors. "Our case law does not always require strict technical compliance with the regulations—all that is required of the plan administrator is 'substantial compliance' with the spirit of the regulations." Santana-Díaz v. Metro. Life Ins. Co., 816 F.3d 172, 182 (1st Cir. 2016). To succeed on a claim of a plan administrator's violation, the First Circuit requires the claimant to show she was prejudiced by the administrative violations. See, e.g., id.; Stephanie I, 813 F.3d at 425-27. In other words, a "remand to the claims administrator for reconsideration of benefits entitlement ordinarily will reflect the court's judgment that the plaintiff's claim is sufficiently meritorious that it must be reevaluated fairly and fully." Gross II, 763 F.3d at 78.

Here Jane's claim falls short. The administrative review of Jane's appeal following the HPHC internal appeal—the external appeal conducted by OPP—did include review of Jane's medical records. AR at 430. Her claim was nevertheless denied. AR at 431. Thus, Jane has failed to make out a claim for HPHC's procedural violations.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Jane's motion for summary judgment, D. 56, and ALLOWS HPHC's motion for summary judgment, D. 63.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge