## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JANE DOE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) | |
| HARVARD PILGRIM HEALTH CARE, INC., AND THE HARVARD PILGRIM PPO PLAN MASSACHUSETTS, GROUP POLICY NUMBER 058866000, | ) ) ) ) ) | Civil Action No. 15-10672 |
| Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **August 6, 2019**

### I.      Introduction

Plaintiff Jane Doe ("Jane") has filed this lawsuit against Defendants Harvard Pilgrim Health Care, Inc., and the Harvard Pilgrim PPO Plan Massachusetts, Group Policy Number 0588660000 (collectively "HPHC") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging HPHC's partial denial of health insurance benefits for residential mental health treatment.  D. 1.  This Court previously denied Jane's motion for summary judgment and allowed HPHC's cross-motion on her claims under the HPHC health insurance plan (the "Plan") based upon the administrative record as of March 12, 2013.  Doe v. Harvard Pilgrim Health Care, Inc., No. 15-cv-10672-DJC, 2017 WL 4540961 (D. Mass. Oct. 11, 2017) ("Doe I").  The First Circuit reversed in part, remanded in part and vacated Doe I, holding that the administrative record for judicial review included documents considered as part of

1

HPHC's review of Jane's claim after the institution of this lawsuit and concluding in a denial of benefits on February 26, 2016 (the "post-filing review").  See Doe v. Harvard Pilgrim Health Care, Inc., 904 F.3d 1 (1st Cir. 2018) ("Doe II").  The Court now considers whether Jane's residential treatment, as opposed to treatment in other settings, during her first admission after February 12, 2013 was medically necessary in view of the administrative record as of February 26, 2016.  For the reasons explained below, the Court concludes that Jane has not met her burden to show by a preponderance of the evidence that she was entitled to coverage of residential treatment during the period of February 13, 2013 through June 18, 2013 under the Plan.  The Court, therefore, ALLOWS HPHC's renewed motion for summary judgment, D. 113, and DENIES Doe's motion for summary judgment and attorney's fees and costs, D. 104.

## II.    Prior Rulings from the District Court and First Circuit

On October 11, 2017, this Court concluded that Jane's residential treatment at the Austen Riggs Center ("Riggs") was not medically necessary under the Plan after February 12, 2013 where Jane sought coverage for the full period of her first admission, from January 17, 2013 through June 18, 2013.  Doe I, 2017 WL 4540961, at *11-13.  The Court reviewed Jane's medical records and other documents up to and including March 12, 2013, when the Independent Medical Expert Consulting Services, Inc.'s ("IMEDECS") expert reviewer upheld HPHC's denial of coverage for Jane's treatment as part of an independent external review initiated by the Massachusetts Department of Public Health's Office of Patient Protection ("OPP").  Id. at *10-11 (accepting "the March 12, 2013 OPP decision as the 'temporal cut off point' for the administrative record") (citations omitted).  The Court also denied Jane's motion to expand the scope of the administrative record to include medical records and opinions that post-dated the March 12, 2013 decision and which HPHC had considered as part of the post-filing review culminating in a denial of Jane's claim on February 26, 2016.  Id. at *9.

On September 6, 2018, the First Circuit held, in relevant part here, that "the administrative record for purposes of reviewing the benefits decision in this case includes the documents submitted or generated as part of the post-filing review process as concluded on February 26, 2016." Doe II, 904 F.3d at 9. The First Circuit vacated and remanded to this Court to consider whether Jane satisfied her burden to prove her treatment was medically necessary on the expanded administrative record. Id. at 11. Jane has now filed a renewed motion for summary judgment along with a request for attorney's fees and costs, D. 104, and HPHC filed a cross-motion for summary judgment, D. 113. The Court heard the parties on the pending motions and took the matters under advisement. D. 124.

## III.    Standard of Review

"Where, as here, the plan does not unambiguously provide the administrator with discretionary authority to determine benefit eligibility, the court's review of the administrator's determination is *de novo*." Kamerer v. Unum Life Ins. Co. of Am., 334 F. Supp. 3d 411, 420 (D. Mass. 2018) (citing Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)). On summary judgment under ERISA, "the factual determination of eligibility for benefits is decided solely on the administrative record" and the "non-moving party is not entitled to the usual inferences in its favor." Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (quoting Orndorf, 404 F.3d at 517)). "[W]here review is based only on the administrative record before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue." Orndorf, 404 F.3d at 517.

"In reaching its decision on the record, a district court on de novo review 'may weigh the facts, resolve conflicts in the evidence, and draw reasonable inferences.'" Doe II, 904 F.3d at 10 (quoting Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 852 F.3d 105, 111 (1st Cir. 2017) ("Stephanie II")). "The district judge will be asking a different question as [s]he reads

the evidence, not whether there is a genuine issue of material fact," but instead whether, as alleged here, Jane's treatment was medically necessary under the terms of the Plan.  See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).  The "ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage."  Stephanie II, 852 F.3d at 112-13.

## IV.   Factual Background

Unless otherwise noted, all facts are undisputed and are drawn from the administrative record ("AR"), D. 109, and the parties' statements of fact, D. 108; D. 115; D. 117; D. 122.  The Court previously recounted the facts in Doe I and will not repeat them all here, except as necessary for explaining the Court's analysis.

During Jane's freshman year of college in 2012, she suffered from anxiety and depression and, subsequently, experienced hypomania, hallucinations and suicidal ideation.  AR at 438. Jane's mental health deteriorated to the point that she was hospitalized on two occasions.[1]  AR at 442.  Jane's therapist, Audrey Rubin, M.D., referred Jane to Riggs, an out-of-network psychiatric residential treatment center in Stockbridge, Massachusetts.  Id.  Riggs admitted Jane on January 17, 2013.  Id.  She received treatment there until June 18, 2013 ("first admission"), when she was discharged for inpatient treatment at Berkshire Medical Center ("BMC").  AR 990.  Riggs readmitted Jane on June 24, 2013; she remained there until her discharge in August 2013 ("second admission").  D. 115 ¶¶ 20, 23; D. 122 ¶¶ 20, 23.

---

[1] HPHC disputes several facts alleged by Jane that contain characterizations of documents only to the extent the document speaks for itself and does not otherwise dispute the authenticity of the underlying document or the Court's authority to consider the same in resolving the pending motions discussed herein.  See, e.g., D. 117 ¶ 14.

**A.**     **Residential Treatment at Riggs During the Relevant Time Period**

*1.      First Admission:  January 17, 2013 through June 18, 2013*

David Flynn, M.D. conducted Jane's initial clinical assessment on January 17, 2013.  AR 438-44.  Jane was diagnosed with psychotic disorder NOS, mood disorder NOS and non-verbal learning disorder.  AR 440.  Jane denied "current suicidal ideation, intent, or plan at the time of admission."  AR 439.  Her medication regimen at the time included Lamictal, Abilify and Seroquel.  Id.  As part of the criteria met for admission to Riggs, Dr. Flynn explained that Jane had experienced a "significant deterioration in functioning which has been unresponsive to . . . treatment at a less intensive level of care," AR 442; Jane possessed certain symptoms that "mitigate[d] against successful outpatient treatment," including suicidal behavior, self-destructive behavior, inability to live autonomously, anxiety, depression and mania/hypomania, id.; and she required support to a level that could not be accomplished in a less restrictive level of care, including psychotherapy in an integrated hospital environment and twenty-four-hour nursing observation and intervention, AR 443.  Dr. Flynn, as a result, recommended Rigg's "IRP-G" treatment program, and noted Jane would undergo at least a "[s]ix week evaluation and treatment admission with longer term treatment possible."  AR 443.

Jane initially experienced a difficult transition to residential treatment.  AR 703 (reporting that Jane told nursing staff she was "having a difficult time transitioning to a 'new place'"); AR 705 (explaining that Jane had two panic attacks shortly after her admission and describing Jane's concern that "intense" group therapy sessions may have caused "too much stimulation around her trauma issues").  As the month of January progressed, however, Jane engaged with peers at Riggs, AR 704, 706; left Riggs's campus to shop with her family, go out with friends and visited an art store, AR 704, 706, 709-10; and she also developed a close relationship with a male resident, AR 707.  Although Jane appeared to be adjusting to her new environment, she experienced what her

5

treating therapist, Sharon Krikorian, M.D., described as a "manic" episode in late January.  AR 448; see AR 707.  On or about January 24, 2013, Jane explained that, following a stressful phone conversation with her mother and brother, she saw "paper people coming out of the walls and dancing and then sticking knives in her ankles."  AR 448; see AR 708.  When Jane described her hallucination to nursing staff, they noted that Jane stated that she was ready to be around other people after reporting the incident.  AR 709.  Jane told staff the next day "she was feeling better" and had made plans to go bowling with friends that evening.  AR 709.  Dr. Krikorian's monthly progress note for January indicates that Jane's "cognition [wa]s generally intact" and "[h]er thought process [w]as generally goal oriented," but that she can "quickly become overwhelmed." AR 448.  Dr. Krikorian also reported that Jane was responding "well" to an increase in her Seroquel dosage.  Id.; see AR 466.

In February 2013, Jane shopped with peers, AR 714, went "dumpster diving," AR 726-27, created a self-imposed art project, AR 711-12, and discussed her creative talent and the possibility of going to art school with nursing staff, AR 732.  Staff noted on several occasions, however, that Jane was having a hard time with a male peer at Riggs with whom she had a romantic relationship. AR 714, 718, 722, 735.  Jane also continued to experience hallucinations.  Jane told nursing staff on February 10, 2013 that she "heard the voice of an older man telling her to hurt herself," but "was able to not give in to his words"  and did not otherwise possess a suicidal "plan, means or intent."  AR 722.  Jane mentioned prior to this hallucination that she struggled with family dynamics and her romantic relationship with a male peer, which she described as a "constant source of anxiety since her arrival."  Id.  Nursing staff placed Jane in the PAS program, which involved moving her to a room in closer proximity to nurses and without a roommate.  Id.  Over the next couple days, Jane reported that "the voice was not there" and she was glad to be near the

nurses.  AR 722-23.  She "negotiated to go out" with a friend to "buy something at Staples."  AR 723.  Jane's "suicidal ideation and thoughts of cutting" were "manageable" at the time and she denied any plan or intent of self-harm or hearing any voices.  AR 725.

Jane reported another hallucination on February 25, 2013, when she approached nursing staff and stated she felt "snakes on [her] legs."  AR 733.  Jane explained that, despite the hallucination, she knew she was safe and she had no intention of harming herself.  Id.  Later that day, she was observed interacting with peers and reported "doing better . . . than she was earlier in the day."  Id.  Dr. Mintz posited that Jane's hallucinations of snakes on her body might relate to experiences of akathisia from her Seroquel prescription.  AR 1046.  Dr. Mintz also worried that Jane's psychotic symptoms related to a seizure disorder, which could be exacerbated by Seroquel's lowering of her seizure threshold.  AR 476.  By this time, Riggs had revised Jane's diagnosis from "bipolar to schizoaffective disorder" and "added hysteria and partial complex seizures to the differential, particularly given the atypical nature of [Jane's] hallucinations . . . and a dramatic quality to some of her symptomatic displays, which increased in the context of interpersonal experiences of loss or rejection."  AR 1046.  On February 27, Jane told nursing staff she was "experiencing delusions around people outside of Riggs, hiding in bushes, watching her and waiting to hurt her."  AR 734-35.  Dr. Krikorian's monthly progress note for February suggests that Jane's mental health may have been impacted by Jane's romantic relationship with a male peer.  AR 450.  Riggs nonetheless approved Jane for medication self-administration on February 28.  AR 543.

Jane did not report any hallucinations or manic episodes in March or April.  See AR 452; AR 454.  Jane told nursing staff in early March that she wanted to "come off all [her] meds and have a clear mind" and that she was frustrated with the community at Riggs.  AR 742.  Her

frustration and desire to leave Riggs coincided with issues in her romantic relationship with a male peer.  AR 736-37; see AR 742; AR 746; AR 751.  In April, however, Jane travelled to New York to visit a male peer, who had been discharged from Riggs.  AR 772.  Upon her return, Jane reported feeling "good enough" and looking forward to "starting a new medication to see if this may help her be more creative and better than 'good enough.'"  AR 777.  A few days later, on April 20, 2013 and in reaction to the Boston Marathon bombings, Jane told nursing staff "she wishes she could act out on her homicidal feelings like he did, but knows the consequences and would never do that."  AR 779.  By April 22, 2013, Jane had resumed her routine at Riggs and was observed in common areas engaging with peers and staff.  AR 782.

Jane made a few trips home in April and May 2013.  In late April, Jane went home to visit her family for a few days.  Jane reported afterwards that home was "awful."  AR 785.  Jane nonetheless went home again for knee surgery between May 2, 2013 and May 5, 2013.  AR 790-92.  She declined an offer to talk to nursing staff upon her return to Riggs, AR 792, and later explained that she thought her trip "went well," AR 794.  Despite complaints of intense "midday sedation" in connection with a medication change and partial loss of consciousness, AR 912, Jane requested a pass to spend the week with her family from May 24, 2013 through May 28, 2013, AR 803.  Jane described this visit as enjoyable despite the fact that she "fainted" which she attributed to stress.  AR 968.

Beginning in late May, Jane reported losing consciousness and fainting spells while at Riggs.  AR 968-75.  On June 6, 2013, Jane wandered away from Riggs and explained afterwards that she was chasing a hallucinated giraffe down the street.  AR 977-78.  Jane explained that her symptoms, including the hallucinations and loss of consciousness, might be related to a seizure disorder based upon her conversations with Dr. Mintz.  AR 977.  Dr. Mintz had identified the

possibility of seizure disorders soon after Jane was admitted to Riggs, and he stressed that it was important to determine whether Jane's symptoms "have [a] neurological basis." AR 466.  Jane had the appointment for an EEG to determine whether she had a seizure disorder on June 4.  <u>See</u> AR 974.  Jane expressed concern regarding the outcome of her EEG while awaiting the results, which she hoped would confirm the seizure disorder diagnosis.  AR 972.  Jane explained to nursing staff that she preferred this diagnosis because of its "concrete[ness]" and because she wanted to "have a condition that is treatable."  <u>Id.</u>; <u>see</u> AR 974.  According to Dr. Mintz's pharmacology notes, he believed Jane's hallucinations in June occurred "in the context of a disruption in an interpersonal relationship with a male peer."  AR 916.  Around the same time, Jane's relationship with another male peer at Riggs grew "complicated" and she discussed the same with nursing staff. AR 972, 979.

Jane's EEG did not show any seizure activity.  AR 918.  On June 11, Jane reported feeling "very weird, scared, and tearful" and "disappointed" after receiving the results of the EEG, which indicated that she did not have a seizure disorder.  AR 983; AR 949.  Jane continued to express her disappointment with the the results of her EEG over the next few days.  AR 984, 986.  On June 18, 2013, Jane was found lying on the floor of her room with bloody scratches on her leg.  AR 989.  Nursing staff found a broken razor on the sink.  <u>Id.</u>  Jane explained that she was trying to write "kill" on her leg with the razor and had experienced a frightening hallucination prior to cutting herself.  <u>Id.</u>  After staff determined that Jane was an immediate danger to herself, she was transported for inpatient psychiatric evaluation in a locked unit at BMC.  AR 990.  While there, physicians discontinued Jane's prescription for Geodon, and prescribed Clozaril, an antipsychotic medication.  AR 1028.

2.      *Second Admission: June 24, 2013 through August 2013*

Jane was discharged from BMC and returned to Riggs on June 24, 2013.  AR 1045.  Dr. Krikorian noted that Jane "struggle[d] with complicated and powerful feelings about family, friends, [and her] therapist that she expresses through psychotic process."  AR 1036.  In a monthly progress note for June, Dr. Krikorian stated that Jane's cognition was grossly intact and she denied suicidal and homicidal ideation or intent.  AR 1038.  In July, Dr. Krikorian reported that Jane continued to have visual hallucinations, but was less overtly angry and did not possess suicidal ideation or intent.  AR 1039.  Jane told nursing staff in late July that she felt like her Clozaril prescription was "starting to show some positive results" and that she had been "waking up in a good space and having productive days with some delusions."  AR 1185.  Dr. Krikorian suggested that, no earlier than August 7, 2013, Jane's psychosis and behavior could be safely managed and adequately treated at a lower level of care.  AR 1246.  HPHC does not dispute that Jane's residential treatment at Riggs during the second admission, between June 24, 2013 and August 7, 2013, was medically necessary.

### B.      HPHC's Coverage Determinations for Jane's Residential Treatment

HPHC agreed to cover a portion of Jane's first admission to Riggs, including the period from January 17, 2013 to February 12, 2013, and all of her second admission from June 24, 2013 to August 7, 2013.  Based upon review of Jane's mental health history, medical records from Riggs, conversations with Jane's clinicians and medical opinions generated as part of the post-filing review, HPHC maintains—and Jane disputes—that residential treatment during the first admission after February 12, 2013 was not medically necessary as defined under the Plan.[2]

---

[2] The Plan defines medical necessity as follows:

[t]hose health care services that are consistent with generally accepted principles of professional medical practice as determined by whether:  (a) the service is the most

1.      *HPHC's Initial Coverage through February 5, 2013*

At the time of Jane's treatment, HPHC contracted with United Behavioral Health ("UBH") to manage mental health benefits and review initial coverage determinations for HPHC Plan beneficiaries.  AR 89-94.  HPHC utilized UBH's Optum Level of Care Guidelines ("Guidelines") to determine whether requested mental health treatment was medically necessary and, therefore, covered under the Plan.  Id.  The Guidelines indicate that the Plan covers "[r]esidential services . . . delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure."  AR 89.  To qualify for residential treatment level of care, one of the following criteria must be met:

> (1) the member is experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting; or (2) there is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care; or (3) the member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a residential treatment center is necessary.

Id.

HPHC approved initial coverage of Jane's treatment at Riggs on January 18, 2013.  AR 232.  Relying upon the initial assessment conducted by Riggs' clinicians, HPHC found that Jane

---

appropriate supply or level of service for the Member's condition, considering the potential benefit and harm to the individual; (b) the service is known to be effective, based on scientific evidence, professional standards and expert opinion, in improving health outcomes; and (c) for services and interventions that are not widely used, the use of the service for the Member's condition is based on scientific evidence.

AR 21-22.

satisfied at least one of the above mentioned criteria, noting (among other things) that Jane had previously expressed suicidal intent with "plans to jump off roof or [overdose]," had four psychotic episodes, multiple inpatient admissions in the previous year and poor responses to medication.  Id. Jane initially requested coverage for twenty-eight days of residential treatment; HPHC approved coverage for seven days (i.e., until January 23, 2013).  AR 95, 231-32.

HPHC extended Jane's coverage through February 5, 2013 based upon conversations between Dr. Krikorian and UBH clinician, Martin Rosenzweig, M.D., as part of UBH's peer-to-peer review process on January 29, 2013.  AR 95-100; AR 272.  Dr. Krikorian explained that Jane needed the "structure of residential as she needs nursing support when she is unable to sleep and her parents do not have the ability to help her when she is home."  AR 272.  Dr. Krikorian stated that although Jane was not "currently actively suicidal" at the time and was "able to sustain her safety in an unlocked residential setting," she did not meet Riggs criteria for "step down to [partial hospitalization programs]."  Id.  Dr. Rosenzweig, nonetheless, concluded that Jane was not meeting the criteria for continued residential care and could be readied to step down to partial hospitalization.  Id.  He approved three additional days of residential treatment for the purpose of preparing a good discharge plan with the involvement of Jane's parents.  Id.  UBH case notes from January 31, 2013, prior to the next scheduled peer-to-peer review, indicate that Riggs clinicians reported there was "nothing new to add" from UBH's last review of Jane's condition and that there were no changes to her medication regimen during this time. AR 278.

> 2.    *Denial of Continued Coverage for Residential Treatment from February 13, 2013 through June 18, 2013*

On February 4, 2013, James W. Feussner, M.D., Associate Medical Director of UBH, performed a peer-to-peer review with Dr. Krikorian to assess whether continued residential treatment at Riggs was medically necessary, AR 305, and consistent with the Guidelines, which

require that Plan beneficiaries meet six criteria to warrant continued coverage, including, as is relevant here:  (1) "criteria for the current level of care continue to be met" and (6) "member's current symptoms and/or history provide evidence that relapse or a significant deterioration in functioning would be imminent if the member was transitioned to a lower level of care or, in the case of outpatient care, was discharged," AR 93-94.  Dr. Krikorian again reported that Jane was not actively suicidal or psychotic and noted that she had "improved" with her "medication regimen," which had not been adjusted in two weeks.  AR 305-306.  Dr. Krikorian maintained, however, that Jane should continue residential treatment at Riggs for four-to-six weeks for an evaluation and then her clinicians at Riggs would determine how long she needed to stay there for treatment.  AR 306.  Dr. Feussner concluded that Jane did not meet the residential treatment level of care criteria set forth in the Guidelines.  AR 310.  Accordingly, in a letter dated February 5, 2013, HPHC explained that effective February 6, 2013, Jane's residential treatment at Riggs would no longer be covered under the Plan.  AR 404.  The letter quoted Dr. Feussner's assessment, stating Jane's "acute crisis bringing [her] to the hospital has quieted" and that "[a]lthough [Jane] continue[d] to have challenges in dealing with stressors and relationships, [she] [was] able to move towards recovery . . . and [did] not appear to need further help from residential level of care.  [She] can continue to work on healthy coping strategies with [her] Mental Health Partial Hospitalization Services."  AR 404-405.

Following the February 5, 2013 denial of continued coverage, Jane initiated an expedited internal appeal pursuant to which Michael Bennett, M.D., a UBH physician and board-certified psychiatrist, considered Jane's medical history and UBH case notes, including relevant peer-to-peer reviews, and discussed Jane's condition with Dr. Krikorian.  AR 409-10.  During their conversation, Dr. Krikorian stated that Jane's "voices have returned, although not as intensely as

before," that there "may be a change in mediation," and that Riggs viewed the goal of treatment as helping Jane "deal with [her] feelings in a long-term, protected setting." AR 409. Dr. Bennett, nonetheless, found that Jane was "not currently psychotic and not suicidal and has improved on her current medications" and concluded on February 12, 2013 that Jane might be "safely able to pursue treatment while living at home and attending outpatient treatment, beginning with [partial hospitalization programs]." Id. Continued residential treatment, therefore, was not medically necessary as Jane did not meet continued service criteria one and six. Id. In a letter, dated February 12, 2013, HPHC explained that based on Dr. Bennett's review, its denial of coverage for residential treatment was being upheld on appeal, but that treatment during the pendency of the appeal, i.e., February 6, 2013 through February 12, 2013, would be covered. AR 410.

Having exhausted HPHC's internal review process, Jane appealed to the OPP, which retained IMEDECS to conduct an independent, external review of Jane's claim. AR 424-29. IMEDECS independent expert, who is not identified by name, was described as a board-certified adult and child psychiatrist and an assistant clinical professor of psychiatry who also maintained a private practice in a psychiatric hospital. AR 433. The independent expert considered Jane's medical history, including prior hospitalizations and threats of suicide, as well as her medical records from Riggs and the UBH Guidelines. AR 434-35. On March 12, 2013, IMEDECS informed Jane that the independent expert reviewer upheld HPHC's determination "in full" given "there was no evidence that [Jane] required 24 hour supervision or nursing care" as of February 13, 2013, and she denied active suicidal or homicidal ideation. AR 435. According to the independent expert, the symptoms described in Jane's medical records were not severe enough to prevent her from participating in treatment at a lower level of care such as a partial hospitalization

program.  Id.  Jane's appeal process culminated in the OPP's conclusion that residential treatment at Riggs was not medically necessary as of February 13, 2013.  Id.

Later on October 18, 2013, Dr. Krikorian submitted a letter to HPHC asserting that the residential treatment Jane received between February and June 2013 was medically necessary and appropriate "given the particular nature of her illness and the unsuccessful consequence of other treatments efforts."[3]  AR 1239.  The letter indicated that, as of June 2013, Jane had been diagnosed with schizoaffective disorder, post-traumatic stress disorder, learning disability NOS and personality disorder NOS.  AR 1240.  Due to these diagnoses, Dr. Krikorian stated that Jane "needed an environment that provided support and enough structure . . . to allow her to do intensive treatment necessary  . . .  to resolve her significant difficulties and learn to prevent future deterioration."  AR 1241.  Dr. Krikorian explained further that Riggs is "such an environment," with its "open, voluntary, residential treatment facility," including twenty-four-hour nursing availability.  Id.  As further support for Dr. Krikorian's assessment that Jane's residential treatment at Riggs was medically necessary, she described Jane's psychotic episodes and hallucinations during the period for which coverage was denied, including when Jane reported hearing a "male voice telling her to harm herself" on February 10, 2013.  AR 1242.  Dr. Mintz acknowledged, however, that "[o]ther things" suggested that Jane's symptoms might be "hysterically elaborated," including "the coincidence of her symptoms" with interpersonal challenges with her peers.  AR 1244.

---

[3]  In a letter, dated January 15, 2014, Dr. Krikorian asserted that Jane's treatment at Riggs between June 24, 2013 and August 7, 2013 was also medically necessary.  D. 109-1 at 635.  Given that HPHC agreed to cover Jane's treatment during this period, the Court does not address the January 2014 letter here.

### 3. Post-filing Review

After the institution of this action on March 12, 2015, HPHC agreed to additional administrative review of Jane's claim for coverage. AR 1264-66. Accordingly, HPHC's Medical Director, Joel Rubinstein, M.D., considered medical records from Jane's first admission, see AR 1329, UBH records, HPHC records and clinical discussions with Dr. Krikorian and Dr. Mintz. AR 1264-66. The report prepared by Edward Darell, M.D., an HPHC clinician who determined that Jane's second admission at Riggs was medically necessary on February 19, 2014, was also included in the administrative record. See AR 1324, 1261-63. On September 28, 2015, Dr. Rubinstein became the third clinician (after Drs. Feussner and Bennett) to conclude that Jane could have been stepped down to a lower level of care as of February 13, 2013. AR 1264-66.

Jane submitted the medical opinions of Gregory Hines, M.D., an independent medical reviewer hired by Jane to opine on the medical necessity of her treatment, and Eric Plakun, M.D., Director of Admissions and Associate Medical Director for Riggs, in response to Dr. Rubinstein's opinion. AR 1267, 1281, 1330. In a letter dated February 26, 2016, HPHC's general counsel sent a letter to Jane's counsel affirming its denial of Jane's claim. AR 1327-31.

## V.     Discussion

### A.     The Administrative Record

This Court previously held that Jane did not meet her burden of demonstrating that residential treatment at Riggs during the first admission after February 12, 2013 was medically necessary based upon the Court's review of medical records and opinions up to and including March 12, 2013, when OPP upheld HPHC's denial of coverage for residential treatment as part of an independent, external review process. Doe I, 2017 WL 4540961, at *10-12. In light of the First Circuit's ruling in Doe II, the Court now considers whether Jane's continued residential treatment during the first admission after February 12, 2013 was medically necessary in view of "the

documents submitted or generated as part of the post-filing review process as concluded on February 26, 2016," including "[Jane's] medical records from both admission to Riggs, as well as the reports of Dr. Darrell [sic], Dr. Harris, Dr. Plakun, and Dr. Krikorian." Doe II, 904 F.3d at 9.

HPHC contends, as a preliminary matter, that medical records and opinions post-dating the OPP's decision on March 12, 2013 upholding HPHC's denial of continued coverage are not relevant here even though the First Circuit concluded such documents are part of the administrative record. D. 114 at 9-11. HPHC argues that these documents "simply shed no light on Doe's condition at the time of [HPHC's] denial," therefore, the Court need not consider them in its *de novo* review. Id. at 10. The First Circuit's decision in Doe II establishes February 26, 2016 as HPHC's final administrative decision and the "temporal cut off point" for judicial review. Doe II, 904 F.3d at 6 (quoting Orndorf, 404 F.3d at 519 (explaining that "the final administrative decision acts as a temporal cut off point" such that a "claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the administrative decision")). On February 26, 2016, HPHC provided "concluding remarks" on the post-filing review process, as well as a description of documents and reasoning underlying this final administrative decision denying coverage for Jane's stay during the first admission at Riggs after February 12, 2013. AR 1327. HPHC determined that the residential treatment "for this entire period" was not medically necessary based upon "treatment records up through June 17, 2013;" id., Dr. Rubinstein's assessment from September 28, 2015, including conversations Dr. Rubinstein had with Drs. Krikorian and Mintz, AR 1329; and additional documents submitted by Jane on December 3, 2015, including the opinions of Drs. Harris and Plakun, AR 1329, AR 1326. Although not mentioned in HPHC's February 2016 letter, HPHC agreed as of August 13, 2015 to include other documents in its post-filing review, including (1) a letter from Jane dated February 19, 2014, attached medical

records from January 17, 2013 through August 14, 2013 and opinions from Dr. Krikorian dated

October 17, 2013 and January 15, 2014; and (2) a clinical review report prepared by Dr. Darell on

February 19, 2014.  See AR 1324 (explaining that "the parties' agreed-to parameters of HPHC's

medial review" include Jane's February 19, 2014 letter, exhibits attached thereto and Dr. Darell's

medical report).

To the extent HPHC now contends that such documents are not relevant here, the Court

rejects that argument given HPHC's consideration of these documents as part of its final decision

as to Jane's residential treatment through June 18, 2013 and the First Circuit's conclusion that the

same should be reviewed as part of the administrative record.  Although the Court will not discount

all documents post-dating the March 12, 2013 OPP decision (as HPHC suggests is appropriate), it

recognizes that certain documents bearing upon Jane's mental ailments during her second

admission, for example, may have less probative value than medical records and opinions

concerning the medical necessity of Jane's residential treatment during her first admission.  See

Weisner v. Liberty Life Assurance Co. of Bos, 192 F. Supp. 3d 601, 614 (D. Md. 2016) (explaining

that the district court on *de novo* review of a decision denying benefits "must resolve questions of

material fact, assess expert credibility, and—most critically—weigh the evidence"); see also

Bethany Coleman-Fire v. Standard Ins. Co., No. 3:18-CV-00180-SB, 2019 WL 2011039, at *9 (D.

Or. May 7, 2019) (stating that "[w]hen a court engages in *de novo* review, it may evaluate and give

credence to the [evidence] that it finds more reliable and probative").

## B.   Medical Necessity

The Court does not seek to diminish the seriousness or severity of Jane's symptoms during

the relevant time period or the need for her continued psychiatric treatment, even if it were not

exclusively in a residential treatment setting as disputed by the parties here.  The "correctness, not

the reasonableness, of [HPHC's] denial of [Jane's] benefits is [the Court's] only concern" on *de*

18

*novo* review.  Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013).  After a close review of the record, the Court concludes that Jane has not met her burden to prove by a preponderance of the evidence that residential treatment at Riggs was medically necessary from February 13, 2013 through June 18, 2013.

### 1.   Necessity of Residential Treatment Level of Care under the Plan

The Court is not persuaded that Jane's symptoms required a residential treatment level of care during the relevant period based upon this record.  Treatment that is medically necessary under the Plan must be, among other things, "the most appropriate . . . level of service for the Member's condition, considering the potential benefit and harm to the individual."  AR 22.  UBH Guidelines define residential treatment as "[r]esidential services . . . delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure."  AR 89.  Residential treatment level of service is appropriate at least where (1) the "member is experiencing a disturbance in mood, affect or cognition resulting in behavior that cannot be safely managed in a less restrictive setting," (2) "there is imminent risk that severe, multiple and/or complex psychosocial stressors will . . . undermine treatment in a lower level of care" or (3) the "member has a co-occurring medical disorder or substance use disorder which complicates treatment" to the extent that residential treatment is necessary.  Id.  The parties do not contend, and the Court has not otherwise concluded, that Jane had a medical disorder or substance use disorder that necessitated residential treatment as described in the last consideration for residential level treatment of care.  The Court, therefore,

addresses whether residential treatment was necessary under the first or second prong of the Guidelines for residential treatment level of care.[4]

> a)   Jane's Symptoms Could Be Safely Managed in a Less Restrictive Setting

Jane contends that her symptoms could not have been managed in a less restrictive setting because she required the twenty-four-hour structure of residential treatment at Riggs.  D. 105 at 5-8, but the administrative record reveals that such twenty-four-hour structure was not medically necessary.

Jane argues that residential treatment (and, by extension, its twenty-four-hour structure) was necessary because she regularly sought help from Riggs's nursing staff, especially in evenings or at night.  Id. (collecting examples of Jane's interactions with nursing staff in the evening, at night and early morning).  Jane asks the Court to consider, for example, that on February 10 and June 6, 2013, Jane was admitted to Riggs's PAS program, which involved relocating to a different room in closer proximity to nursing staff and/or closer monitoring and patient safety assessments. AR 722-25, 977.  In connection with her relocation to a PAS room, Jane told nursing staff that she "fe[lt] safe being so close to the nurses [sic] station," AR 723, and that "PAS was very helpful," AR 725.  On both occasions resulting in her admission to the PAS program, however, Jane had previously alerted staff to her need for additional monitoring and support during normal working hours.  AR 722 (indicating that Jane was moved to a PAS room after speaking with nursing staff at 2:25 p.m.); AR 976 (explaining that, on June 5, 2013 at 1:24 p.m., less than twelve hours before

---

[4] The Court has considered Jane's Notice of Supplemental Authority, D. 126, and HPHC's response to same.  D. 127.  Since that authority, Dominic W. v. The Northern Trust Co. Employee Welfare Benefit Plan and Health Care Serv. Corp., 2019 WL 2576558, at *1 (N.D.Il. June 24, 2019), involved different guidelines regarding medical necessity and distinctive factual circumstances concerning Sofia W.'s treatment and progress, the analysis in that case does not compel a different outcome here.

she chased a hallucinated giraffe down the street, Jane told nursing staff she was "doing poorly," believed she had a "psychotic episode" and was "becoming more paranoid").  That is,  even in a less restrictive environment, including a partial hospitalization program that does not provide twenty-four-hour structure, Jane could have accessed nursing staff during the day to develop a plan for safely managing her symptoms should they escalate or become more pronounced at night. Even if the record indicated that provision of PAS services to Jane was helpful, such provision does not compel a conclusion that another level of care would have been inappropriate here.

The Court's inquiry requires focusing not on whether Jane took advantage of and/or benefited from the structure and support offered in residential treatment, but, rather, whether such level of care was medically necessary.  See, e.g., Stephanie II, 852 F.3d at 117 (explaining because ERISA plans are "a form of contract," the inquiry is not whether one's treatment was beneficial to her, "but, rather, whether that course of treatment was covered under the Plan").  Although overnight monitoring and proximity to nursing staff was apparently helpful on the occasions Jane was admitted to PAS over the course of five months, the record indicates that Jane was often able to manage her symptoms without utilizing services unique to residential treatment.  Jane regularly declined additional monitoring or support, even after potentially triggering events, in favor of time alone in her room, simply talking to nurses or therapy.  See, e.g., AR 718; AR 719; AR 733; AR 734-35; AR 741; AR 746-50; AR 772; AR 779.  On most days, moreover, Jane either did not interact with nursing staff or engaged in casual conversation regarding her day.  See, e.g., AR 736-41 (providing Jane's interactions with nursing staff between March 1, 2013 and March 7, 2013).

Jane demonstrated in other ways that she did not require the twenty-four-hour structure of residential treatment during the disputed time period.  She frequently left Riggs's campus in the evenings and spent several nights off campus to visit family and friends.  Jane went skiing with

friends, AR 725, 738; shopping, AR 744; to a concert, AR 747; dumpster diving with friends, 726; to the movies, AR 796; and to an antique show, AR 799. She spent nearly twenty days away from Riggs for vacations and medical appointments during her first admission. See, e.g., AR 760, 772-75, 783-84, 789, 803-806.

The record also includes examples in which the twenty-four-hour structure of residential treatment, including the proximity to and required engagement with other residents, seemed to have a negative impact on Jane's mood and behavior. Jane expressed reservations early on about the rigors of group therapy in residential treatment. See AR 705; AR 560. She also had several interpersonal issues with her peers. See AR 506; AR 742 (explaining that Jane was feeling badly in the community); AR 772.

Where, as here, the totality of the record show that although Jane required continued treatment, she did not need the twenty-four-hour structure of residential treatment by at least February 13, 2013, and other conditions of residential treatment at Riggs seemed to negatively impact Jane's treatment, the Court concludes, even on this expanded record, that Jane's symptoms could have been safely managed in less restrictive treatment.

        b)      Record Shows There was not an Imminent Risk of Psychosocial Triggers That Would Undermine A Lower Level of Care for Jane

On this expanded record, the Court also cannot conclude that there was imminent risk that psychosocial stressors would have undermined her transition to a lower level of care between February 13, 2013 and June 18, 2013. Jane argues, in relevant part here, that her parents were ill equipped to respond to her symptoms and "unstable reactions" to engaging with family. D. 105 at 8. As an initial matter, the record indicates that the symptoms initially prevented Jane from receiving a lower level of care while living at home with her family had diminished in intensity by early February. In 2012, Jane's family reported not feeling comfortable overseeing her care after

she climbed atop the roof of their three-story home and considered jumping off despite being under her family's "nearly 24-hour supervision." AR 1240. Jane was hospitalized shortly thereafter. Id. When Jane was admitted to Riggs in 2013, Dr. Flynn reported her symptoms requiring residential treatment as including suicidal behavior, self-destructive behavior, inability to live autonomously, depression and anxiety and mania/hypomania. AR 442.

After weeks of psychotherapy sessions, twenty-four-hour nursing observation and intervention, group therapy, see AR 443, and an increase in Seroquel to which Jane "responded well," AR 448, however, Jane no longer exhibited at least three of the symptoms responsible for her referral to residential treatment at Riggs. First, Jane was not suicidal or psychotic, as noted by her treating therapist, Dr. Krikorian. AR 392. Second, Jane did not appear to have engaged in self-destructive behavior. Although she reported some hallucinations and thoughts about cutting herself, she did not take "aggressive" action, AR 450, and went to nursing for help, AR 480. Third, Jane displayed an ability to live autonomously, including by leaving Riggs for activities with friends. See, e.g., AR 705-706, 709-10, 714, 723. Finally, Jane's medication regimen had helped with her anxiety, AR 476, she was less prone to manic-like experiences, AR 450, and depression was not among the symptoms described in the February reports prepared by her therapist and psychopharmacologist. See AR 450-51, 474-77.

As to the impact of family interactions on Jane's symptomology, during the initial clinical assessment conducted by Dr. Flynn, Jane described her family as close with a vulnerability towards anxiety but did not otherwise attribute her symptoms to family dynamics. AR 438; see AR 504. In early February, as part of another psychosocial assessment, a Riggs social worker observed that Jane's family was supportive and open to seeking out resources for each member despite challenging dynamics. AR 499. Consistent with this assessment, Jane's parents engaged with

Riggs clinicians throughout her treatment and took advantage of family therapy sessions.  See AR 494-99, 920-23.  Dr. Bennett, who denied Jane's appeal of HPHC's denial of coverage, described Jane's family as supportive in concluding that she "might be safely able to pursue treatment while living at home and attending outpatient treatment, beginning with [partial hospitalization]."  AR 409.  On the other hand, one of the first hallucinations of Jane's first admission occurred shortly after learning that her little brother was not doing well, AR 708, and she expressed a desire to cut while recounting perceived family pressure, AR 722.  Jane's responses to trips home also varied.  Compare AR 785 with AR 794.  Jane nevertheless was able to manage any negative feelings towards family through conversations with nursing staff and her therapist.  Moreover, there is no indication that the family therapy sessions that Jane and her parents found helpful in residential treatment would not have been available at a lower level of care.

c)     Continued Treatment at the Residential Treatment Level of Care
Was Not Medically Necessary

The Court also concludes that Jane was not entitled to continued coverage for treatment during the first admission after February 12, 2013 under the UBH Guidelines "Continued Service Criteria."  AR 93.  The Guidelines anticipate that as the severity of a Plan beneficiary's symptoms diminish, the beneficiary will no longer meet the criteria for her current level of care and can be safely transitioned to another level of care.  Id.  HPHC considers six criteria in determining whether continued service at the current level is appropriate.  Id.  (explaining that beneficiaries must meet all six criteria for continued coverage).  For the reasons previously mentioned, Jane no longer satisfied the residential level of care standard as required by the first criteria for continued coverage.  Id.  (requiring that "(1) The criteria for the current level of care continue to be met").  Continued coverage for the first admission for residential treatment at Riggs was not medically necessary after February 12, 2013 for the additional reason that Jane's symptoms at the time did

not evidence "relapse or a significant deterioration in functioning would be imminent if [she] was transitioned to a lower level of care." AR 94.  Between Jane's admission on January 17, 2013 and HPHC's denial of continued coverage effective as of February 13, 2013, Jane experienced one episode described as "manic" on January 24, 2013.  AR 448.  Jane's treatment at Riggs was covered for nearly three weeks after that incident and, during that time, she responded positively to an increase in Seroquel, noting a decrease in manic-like symptoms for the month of February in general.  AR 450.  Dr. Krikorian also noted that Jane was not suicidal or psychotic by February 4, 2013, and that she improved with the assistance of adjustments to her medication.  AR 305.  There was also one period when Jane was monitored more closely by nurses as part of the PAS program between the more concerning January 24, 2013 delusion and the end of her residential treatment coverage in February.  See AR 722.  The period was brief and Jane was able to seek help and report the problem rather than act on it.  AR 722-225.  She negotiated outings with friends several times, even during this period of monitoring.  Id.  By February 13, 2013, Jane reported that her thoughts of cutting were "manageable," she denied any "plan or intent of self-harm," and denied hearing voices.  AR 725.  For these reasons, the evidence in this record does not indicate that Jane met the criteria for continued residential treatment level of coverage under the Plan.

## 2.  The Medical Opinions

In its analysis, the Court has considered the medical opinions submitted by Drs. Krikorian, Plakun, Harris, Darell and Rubinstein, which were added to the administrative record as part of the post-filing review.  Jane contends that, apart from Dr. Rubinstein, the remaining opinions indicate that the entirety of Jane's first admission was medically necessary.  The Court does not agree.

a)      Dr. Krikorian

Dr. Krikorian provided two letters of support for coverage of the entirety of Jane's residential treatment.  Only the first letter, dated October 18, 2013, concerns Jane's first admission between January 17, 2013 and June 18, 2013.  AR 1239-45.  Dr. Krikorian states that Jane's residential treatment was medically necessary during this first admission because of her complex symptomology, need for twenty-four-hour structure and her inability to control her psychosis with adjustments to her medication.  Id.  First, while the Court credits Dr. Krikorian's assessment of Jane's disorders, the letter at issue does not suggest that Jane's symptomology could not be safely managed in less restrictive setting, for one example, a partial hospitalization program.  Dr. Krikorian opines as to the incompatibility of Jane's symptoms with "psychiatry treatments that are solely focused on rapid stabilization such as 5 day inpatient treatments" or "crisis-focused hospitalizations." AR 1241.  This would explain why hospitalization in an acute setting would not serve Jane's long-term interest in managing her symptoms but does not appear to bear upon whether Jane could have been stepped down to a lower level of care without compromising her safety between February 13, 2013 and June 18, 2013.

Second, for the reasons previously stated, the Court concludes based upon the entirety of the record, that Jane did not require twenty-four-hour structure during the disputed time frame.  Dr. Krikorian acknowledged Jane's difficulties with the structural restrictions of residential treatment in monthly progress notes during the first admission.  See AR 450 (noting Jane's disagreement with "examined living" and "falsely comply[ing]" with aspects of her program in February); AR 452 (asserting that Jane had "felt embroiled in a number of community issues" in March); AR 454 (stating that Jane "felt lost in the community" and had "re-established a connection with another male patient" with whom she discussed "dark emotions and ways to

26

commit suicide" in April); AR 908 (indicating that Jane spoke about not wanting to see Dr. Krikorian treat other patients).

Third, as to Jane's responses to medication, neither Drs. Krikorian nor Mintz have explained why Jane was not prescribed Clozaril during her first admission, especially given Jane's positive responses to this antipsychotic after it was prescribed during her hospitalization in June 2013. See AR 1185 (explaining that the Clozaril prescription was "starting to show some positive results" and that Jane had been "waking up in a good space and having productive days with some delusions"). Regardless, even as Jane adjusted to changes in her medication, she was often able to communicate her symptoms before acting on them or causing harm to herself and others prior to the incident on June 18 that led to her hospitalization and discharge from Riggs.

For these reasons, the Court is not persuaded that Dr. Krikorian's opinion overcomes the evidence on the other side of the scale. In ERISA cases, treating physicians are not entitled to special deference. Doe I, 2017 WL 4540961, at *13 (citing Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir. 2010), cert. denied, 562 U.S. 1102 (2010); Orndorf, 404 F.3d at 526; see Gernes v. Health & Welfare Plan of Metro. Cabinet, 841 F. Supp. 2d 502, 510 (D. Mass. 2012); Jon N. v. Blue Cross Blue Shield of Mass., 684 F. Supp. 2d 190, 203 (D. Mass. 2010)). In addition, it is unclear what internal criteria Dr. Krikorian considered in arriving at her conclusions regarding medical necessity, whether they differ from HPHC's and to what degree.

b)      Dr. Darell

On February 19, 2014, Edward W. Darell, M.D. overturned HPHC's denial of coverage for Jane's residential treatment from June 24, 2013 and August 7, 2013. AR 1261-63. He concluded that residential treatment was medically necessary during this time period given that Jane "would not be able to tolerate a lower level of care such as outpatient treatment . . . and would

most likely decompensate and place herself and others at risk." AR 1263. He noted, however, that at the time of his review and despite Jane's "history of decompensating over a 2 year period," she did "not appear to present an imminent danger to herself or others." Id. Given that Dr. Darell did not consider whether Jane should have received coverage for residential treatment between February 13, 2013 and June 18, 2013, the period at issue here, and the Court's conclusion that the preponderance of the evidence relevant to this period indicates that residential treatment was not medically necessary, the Court is not inclined to extend Dr. Darell's analysis beyond the context he provided.

c)  Dr. Harris

Jane has provided an independent medical review report, dated December 1, 2015, and prepared by Gregory G. Harris, M.D. AR 1272-1331. Dr. Harris, who was retained by Jane's counsel, reviewed treatment records from Riggs as well as correspondence and administrative records from HPHC. AR 1272. He also spoke with Jane's mother, Dr. Krikorian and Dr. Mintz. Id. Dr. Harris did not examine Jane at any time relevant to this litigation. Id. Dr. Harris's letter does not provide new information regarding the medically necessity of Jane's residential treatment. Instead, Dr. Harris responds to Dr. Rubinstein's concerns regarding the reliability of Riggs's diagnosis, AR 1273, and the scientific basis underlying Riggs's residential treatment program for individuals with Jane's disorders, AR 1274. The Court has considered Dr. Harris's opinion about the medical necessity of Jane's residential treatment at Riggs during the time period at issue, AR 1281; see AR 1276, however, for the reasons previously discussed and the balance of the record here, the Court is not persuaded by Dr. Harris's reiteration of the argument that Jane required twenty-four-hour structure, AR 1277.

d)      Dr. Plakun

On November 29, 2015, Eric M. Plakun, M.D., Associate Medical Director of Admissions at Riggs, explained that "a reasonable person who reviewed the evidence would conclude that the 'open setting' residential treatment model developed and used . . . Riggs meets the standard of care" for residential psychiatric treatment.  AR 1271.  Even assuming that this is correct, the Court concludes on this record that residential treatment level of care for the portion of her first admission at issue here was not medically necessary as discussed above.

C.      **Attorneys' Fees and Costs**

1.      *Considering Eligibility for Attorneys' Fees*

ERISA provides that claimants seeking relief may recover "reasonable attorney's fee and costs" at the court's discretion.  29 U.S.C. § 1132(g)(1).  Although some statutory schemes providing for the recovery of attorneys' fees require that such recovery is only available to the "prevailing party," see, e.g., 42 U.S.C. § 1988(b), ERISA requires only that the claimant achieve "some degree of success on the merits."  Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 245 (2010).  A claimant does not satisfy this requirement by achieving "trivial success on the merits" or a "purely procedural victory."  Id. at 255 (citation and alterations omitted).  In Hardt, the Supreme Court acknowledged that the claimant had persuaded the district court that the plan administrator did not comply with ERISA guidelines and that she "did not get the kind of review to which she was entitled under applicable law," resulting in the district court remanding the matter to the plan administrator, which eventually reversed its decision and awarded the claimant benefits.  Id. at 255-56.  In light of the district court's determination, the Supreme Court concluded that the claimant earned "far more" than a purely procedural or trivial victory and was, therefore, entitled to attorneys' fees.  Id. at 256.  The Supreme Court declined to decide whether "whether a remand order, without more, constitutes 'some success on the merits' sufficient to make a party eligible

29

for attorney's fees under § 1132(g)(1)."  Id. at 256.

The First Circuit in Gross v. Sun Life Assurance Co., 763 F.3d 73 (1st Cir. 2014) explained that while "it is unnecessary . . . to adopt a position on whether remand alone is enough to trigger fees eligibility . . . [a] remand to the claims administrator for reconsideration of benefits entitlement ordinarily will reflect the court's judgment that the plaintiff's claim is sufficiently meritorious that it must be reevaluated fairly and fully."  Gross, 763 F.3d at 78.  There, the First Circuit's remand instructions required the district court to order rendering of a new decision from the plan administrator based upon medical evidence that was not "fairly examined during the original administrative process."  Id.  Gross is distinguishable from the instant litigation, where the plan administrator, HPHC, willingly conducted a full review of documents that were not part of the administrative record when Jane instituted the litigation.  Here, the Court did not consider these additional records in Doe I, but there was no suggestion that the administrator had failed to do so.  The First Circuit remanded to this Court to consider these documents included in the administrator's post-filing review.  By contrast to the First Circuit's remand in Doe II, the remand in Gross was "functionally the same" as if the remand to the plan administrator "had been ordered in the first instance by the district court."  Gross, F.3d at 78 n.6 (explaining that there was no distinction between the "[First Circuit's] remand to the district court in [Gross], directing a remand to the claims administrator" and Hardt, where "the remand at issue was directly from the district court to the claims administrator").

Jane nonetheless argues that Gross is relevant here because the First Circuit did not limit fee awards to parties who secured a remand to a plan administrator; rather, attorneys' fees may be appropriate where "an ERISA beneficiary has earned a second look at her claim based on a deficient first review" regardless of whether "the identified flaw is explicitly linked by the

remanding court to a statute or regulation." D. 105 at 18 (quoting <u>Gross</u>, 763 F.3d at 79). Jane appears to suggest that <u>Gross</u> supports a fee award where, as here, the district court is asked to reconsider the merits on a record that includes post-filing review documents previously considered by the plan administrator in denying the underlying benefits claim. This case appears to be distinguishable as well from <u>Gross</u> where the First Circuit noted that the second look worthy of fee eligibility is one that affords the beneficiary a "second chance for 'a full and fair review' of her claim by the plan administrator," <u>Gross</u>, 763 F.3d at 79, which is not the case here.

2.     *Whether an Award of Attorneys' Fees is Warranted*

Even assuming *arguendo* that <u>Hardt</u> and <u>Gross</u> apply and Jane is eligible for an award of attorneys' fees, the Court concludes that such award is not warranted here. "Eligibility for attorney's fees is not sufficient to entitle a party actually to receive attorney's fees, however, in the First Circuit, a five-factor test is used to review fee requests under ERISA." <u>Hatfield v. Blue Cross & Blue Shield of Mass., Inc.</u>, 162 F. Supp. 3d 24, 44 (D. Mass. 2016) (citing <u>Gross</u>, 763 F.3d at 83). These factors are: "(1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions." <u>Cottrill v. Sparrow, Johnson & Ursillo, Inc.</u>, 100 F.3d 220, 225 (1st Cir. 1996).

Here, the first factor does not weigh in favor of granting attorneys' fees. The Court does not conclude that HPHC acted in bad faith by challenging Jane's attempt to add documents to the administrative record that were previously considered as part of a review initiated only by agreement of the parties after the institution of this litigation. The second factor weighs in Jane's

favor to the extent HPHC does not contest its ability to pay.  D. 114 at 22.  However, "capacity to pay, by itself, does not justify an award."  Cottrill, 100 F.3d at 226-27.  The Court does not believe the third factor, deterrence, weighs in favor of a fee award.  Fees may have a deterrent effect by discouraging plan administrators from denying meritorious claims.  Here, although Jane prevailed in having a remand to this Court regarding the proper scope of the record for judicial review, this Court ultimately has upheld HPHC's decision to deny the claim.  The fourth factor also does not weigh in favor of a fee award because the First Circuit's remand requiring the Court to review Jane's claim on an expanded administrative record has no discernible benefit to plan participants who will not necessarily share the unique circumstance of the post-filing review at issue by HPHC in this case.  Finally, the final factor, the relative merits of the parties' positions, also does not weigh in favor of awarding attorneys' fees.  Although Jane's position as to the scope of the administrative record was successful in the First Circuit, she has not satisfied her burden on the merits of her claim for all of the reasons discussed above.  Given the balance of these factors, the Court denies Jane's request for attorneys' fees and costs.

For the foregoing reasons, the Court DENIES Jane's motion for summary judgment and attorney's fees and costs, D. 104, and ALLOWS HPHC's motion, D. 113.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

32